# EXHIBIT A

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FT. LAUDERDALE DIVISION

CASE NO. 21-CV-61654-WPD

MAHMOUD CHARR,

    Plaintiff,

v.

DON KING, individually,
DON KING PRODUCTIONS, INC., a foreign corporation,
EPIC SPORTS AND ENTERTAINMENT, INC., a Florida corporation,
WORLD BOXING ASSOCIATION, INC., a foreign corporation, and
GILBERTO MENDOZA, JR., individually,

    Defendants.
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT WBA'S MOTION TO DISMISS

Plaintiff, Mahmoud Charr ("Charr"), by and through his undersigned counsel, hereby files this Response to Defendant, World Boxing Association, Inc.'s ("WBA"), Motion to Dismiss Counts I, II, VI, and VII of the Amended Complaint and in support thereof states:

### INTRODUCTION[1]

WBA's motion begins by falsely alleging that Charr was stripped of his title because *Charr* did not obtain a visa to enter the United States in time to defend his title. This argument amounts to a classic case of victim blaming. The WBA knows that Charr was prevented from obtaining his visa by Don King and Don King Productions, Inc. ("the King defendants") as part

---

[1] For the convenience of the Court we are submitting with this response a copy of the Amended Complaint and the exhibits annexed thereto and incorporated therein.

1


CIVIL | CRIMINAL

of an illicit pay-to-play scheme devised by the WBA and the other named defendants in this case. This scheme involved the King defendants illegally providing money and things of value to the WBA and Mendoza to, *inter alia*, artificially elevate the rankings of the King defendants' fighter, Trevor Bryan, so that the WBA and Mendoza could later replace Charr with Bryan as the new WBA "Regular" Heavyweight Champion. *See* Compl. at ¶¶32, 36-42, 44-45.[2]

The WBA nonetheless argues that it stripped Charr of his title because he (i.e., through his promotional team) failed to obtain a visa in time for the title bout against Bryan; however, the evidence attached to the Amended Complaint proves this is false. More specifically, "Exhibit C"[3] to the Amended Complaint—a copy of the WBA's standard purse bid contract—expressly states that the "Promoter" (i.e., the King defendants) is responsible for obtaining a fighter's visa. The WBA required this contract for all purse bids at the time the Charr/Bryan bout was scheduled. *See* Compl. at ¶59; and Exhibit C. Still, the King defendants refused to execute the standard purse bid contract thereby preventing Charr from obtaining his visa (which could only be issued if Charr presented a signed copy of the contract to authorities). *Id.* at ¶¶76-77, 79.

Once it was clear the King defendants blocked Charr from traveling to the United States to defend his title, the WBA—consistent with its role in the scheme—provided no opportunity for Charr to appeal this obstruction by immediately stripping Charr's title and sanctioning a new

---

[2] We will not here quote the referenced paragraphs but will simply quote ¶ 44: "Additionally, and as hereinafter alleged, the aforesaid illicit activities committed by King, DKP, Mendoza, and the WBA pursuant to this criminal enterprise (i.e. perpetuated through the WBA organization) have resulted in the WBA stripping Charr of his title as the WBA Regular Heavyweight Champion and fraudulently selecting King's and DKP's fighter, Bryan, to replace Charr as the new WBA Regular Heavyweight Champion."

[3] We would contend that the WBA Ratings criteria, which are appended to the WBA Rules but not included by defendants and Exhibit C to the amended complaint are, in the context of this case, part of the WBA Rules. The ratings criteria are part of the rules and were ignored by the WBA and otherwise violated https://www.wbaboxing.com/wp-content/uploads/2023/01/20221101-WBA-Rules-Adopted-in-Bulgaria-2015-mod.-in-Oct-2020-and-2022.pdf The ratings criteria are appendix B of the Rules (pages 54 to 74).



bout between Bryan and another of the King defendants' fighters, Bermane Stiverne. The WBA similarly inflated Stiverne's rankings so that he could face Bryan in the bout as Stiverne was otherwise unqualified to contend for the WBA "Regular" Heavyweight title. *Id.* at ¶¶78 – 82.

The timeline of events (among other things) exposes the WBA's involvement: As alleged, in the weeks leading up to the fight, Charr repeatedly asked the King defendants for a copy of the signed bout contract so he could obtain his visa from German authorities with his last request made to the King defendants on January 26, 2021. *Id.* at ¶76; and Exhibit J. Despite being aware of Charr's troubles obtaining a visa as a result of the King defendants' obstruction, the WBA proceeded to strip Charr of his title on January 29, 2021—three days later—and thereafter anointed Bryan the new WBA "Regular" Heavyweight Champion. *Id.* at ¶83.[4] At least one WBA official later confirmed it was Mendoza's decision to strip Charr of his title.

In other words, even if the WBA afforded Charr an opportunity to file an appeal based on the King defendants' obstruction, the WBA, Mendoza, and the King defendants maneuvered the situation to ensure any appeal would be futile as they knew Mendoza had the final say and the WBA rules did not award damages to a fighter in this situation. To no surprise, the WBA spins a completely different narrative in its motion while ignoring the fact that its Rules concerning the ratings criteria for fighters were clearly violated by the WBA's inflating the rankings of the King defendants' fighters, Bryan and Stiverne. The WBA's rating criteria are listed in appendix B of the following link: https://www.wbaboxing.com/wp-content/uploads/2023/01/20221101-WBA-Rules-Adopted-in-Bulgaria-2015-mod.-in-Oct-2020-and-2022.pdf (pages 54 to 74).

---

[4] We intend to show at trial that the timeframe was even shorter, but the exact timeframe is not set forth in the Amended Complaint.

3

**BlackSrebnick**
CIVIL | CRIMINAL

There is much in the WBA's Motion to Dismiss that is misleading or flat-out false as is hereinafter addressed. It is also worth noting that the WBA's Motion to Dismiss reads like a motion for summary judgment as it includes a lengthy discussion of alternative "facts" while annexing and misinterpreting WBA rules ("Rules") (which are presented out of context) in an attempt to discredit the allegations underpinning Charr's claims against it in Counts I, II, VI, and VII and otherwise manufacture grounds for dismissing these claims that do not exist. This strategy is ultimately for naught as a motion to dismiss is intended to test the legal sufficiency of a complaint (i.e., whether there are sufficient allegations to support the claims asserted). Because Charr has pled sufficient ultimate facts to support his claims—and because these claims arise from tortious conduct committed by the WBA in Florida and from the WBA's violations of federal statutes (neither of which implicates WBA rules and/or the WBA's internal dispute process)—the Court should deny the WBA's Motion to Dismiss Counts I, II, VI, and VII.

## ARGUMENT

### I. Motion to Dismiss (Legal Standard)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When ruling on a motion to dismiss, the Court "must accept the facts as pleaded to be true and resolve them in the light most favorable to the plaintiff." *Kaloe Shipping Co. v. Goltens Serv.*, 315 F. App'x 877, 879 (11th Cir. 2009). The Court "need not engage in extensive analyses of" fact-intensive inquiries. *Blue Cross Blue Shield*, 2017 WL 2797267, at *7 (quoting *In re Webkinz Antitrust Litig.*, 2010 WL 4168845, at *3 (N.D. Cal. Oct. 20, 2010) (there, reasonable

4

**BlackSrebnick**
CIVIL | CRIMINAL

interchangeability and cross-elasticity of demand)). To this end, "[d]ismissal under Rule 12(b)6 is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v Samples*, 375 F. 3d 1269, 1273 (11th Cir. 2004) (citation omitted).

## II. The WBA Rules Should Be Considered in the Context of Charr's Allegations

The Court should consider the Rules cited in the WBA's motion in the context of the factual allegations in the Amended Complaint including in the context of Charr's claims against the WBA and Mendoza, which are inextricably linked. As pled, the relevant allegations in the Amended Complaint read:

> "Defendant [WBA] is a foreign corporation with its principal address . . . [in] Panama City, Panama 0816-01091 PA. *Id.* at ¶5. [5]
>
> "Defendant [Mendoza] is . . . believed to be a dual citizen of the United States and Venezuela." *Id.* at ¶6.
>
> "The WBA maintains a registered address in . . . Florida and regularly conducts business in Broward County . . . where the claims asserted by Charr against the WBA also accrued." *Id.* at ¶7.
>
> "The WBA is one of four ratings associations in professional boxing. It is . . . considered a corrupt organization. This is in large part due to the WBA's practice of accepting payments and/or gifts from promoters and "fixers" in exchange for fraudulently improving the rankings of fighters." *Id.* at ¶26.
>
> "This pay-to-play scheme enables less talented or unqualified fighters to participate in more profitable bouts (including, in some cases, title bouts), which in turn increases the profits collected by their promoters and/or "fixers" who engage in these illicit back-door dealings with WBA officials." *Id.* at ¶27.
>
> "This fraudulent ranking scheme has been in effect at least since [Mendoza] assumed his current position as the WBA's president in 2015 following the death of Mendoza's father who was the former president of the WBA." *Id.* at ¶28.
>
> "Mendoza has since played a central role in facilitating the ongoing corrupt practices of the WBA upon taking over as president of the organization including, but not limited to, the WBA's well-known pay-to-play fighter ranking scheme." *Id.* at ¶29.
>
> At all times material hereto, Mendoza and the WBA were legally separate and distinct entities who were associated by virtue of Mendoza's role as the current president of the WBA. *Id.* at ¶30.

---

[5] There has been a significant change since this paragraph was first written. The WBA announced that it was moving its headquarters to Houston, Texas, where Mr. Mendoza will presumably reside.

5



**BlackSrebnick**
CIVIL | CRIMINAL

The WBA by-laws purport that the organization operates under an "Executive Committee" structure in which WBA executives make decisions about fighter rankings and other matters. In reality, these decisions are made at the sole discretion of Mendoza in direct violation of the WBA by-laws. *Id.* at ¶31.

The WBA also claims its decisions and fighter rankings are merit-based, but this is also false. The WBA's decisions and rankings are frequently the result of illicit deals between WBA officials and promoters, "fixers" and others who provide economic incentives to WBA officials in exchange for . . . favorable decisions or higher rankings for their fighters. *Id.* at ¶32.

These illicit deals are executed in many forms: In some cases, promoters and "fixers" make payments (or provide things of value) directly to WBA officials. In other instances, promoters and "fixers" will disguise such economic incentives as "donations" or "gifts" to third parties, which in turn launder these incentives to WBA officials. *Id.* at ¶33.

Although Mendoza purports to take no salary or emoluments as president of the WBA, this is false: Mendoza is among the WBA officials who have and continue to receive economic incentives through illicit back-door deals with promoters and "fixers" participating in this scheme—this includes defendants King and DKP." ¶34.

"King and DKP have engaged in these deals with Mendoza since at least 2015 by making payments and/or providing gifts to Mendoza through at least one third-party: Sports Consulting Services, LLC ("SCS"). Mendoza's son and at least one other WBA employee are believed to have been employed by and/or maintained an ownership interest in SCS since August 2018." *Id.* at ¶35.

"[I]t is believed that all payments and/or gifts provided to SCS by King and DKP from August 2018 to the present have been passed along to Mendoza and other WBA officials in exchange for Mendoza and the WBA fraudulently improving the ranking of King's and DKP's fighters . . . ." *Id.* at ¶36.

"Additionally, King and DKP have participated in this ongoing pay-to-play scheme by providing economic incentives directly to Mendoza under false pretenses: For example . . .King and DKP disguised payments (or other economic incentives) to Mendoza as "wedding gifts" that were given by King and DKP to Mendoza in or about February of 2020 in exchange for Mendoza and the WBA continuing to improve the rankings of King's and DKP's fighter, Bryan." *Id.* at ¶37.

"Furthermore, King and DKP [allowed] the WBA to retain money "deposited" by King and DKP for scheduled bouts, which should otherwise have been returned by the WBA to King and DKP under league rules. Additionally, other "fixers" have also admittedly supplied female companionship to WBA officials to 'sweeten" these deals.' *Id.* at ¶38.

"King and DKP at all times knowingly provided these incentives in exchange for Mendoza and the WBA fraudulently elevating the ranking of King's and DKP's fighters including, but not limited to, Bryan, which in turn directly increased the profits King and DKP received as Bryan's promoters in any WBA-sanctioned bouts and/or endorsement deals." *Id.* at ¶39.

"King and DKP began providing the aforesaid illicit economic incentives to Mendoza and the WBA at least as early as the Summer of 2017 shortly before the WBA "inexplicably" began accelerating Bryan's WBA fighter ranking from 10th place in September of 2017 to 1st place in July of 2018." *Id.* at ¶40.

"As part of this scheme, Mendoza and the WBA prepared and disseminated on a monthly basis fraudulent WBA fighter rankings containing Bryan's elevated ranking. These fraudulent rankings were at all times distributed by Mendoza and the WBA via U.S. Mail and the internet (via WBA's website)[6] such that Mendoza and the WBA

6


CIVIL | CRIMINAL

"Despite the clear requirements imposed by the WBA and recognizing the glaring problems with a bout contract submitted by DKP which, *inter alia*, violated the Muhamad Ali Act, Charr's counsel conferred with the WBA Championships Committee Chair, Carlos Chavez ("Chavez"), about the terms in the contract as well as about DKP's refusal to sign the [contract] in accordance with WBA rules, to no avail. Under WBA rules, the WBA should have defaulted DKP for refusing to use the WBA Bout Contract: This did not occur." *Id.* at ¶¶66, 67.

"Instead, DKP and King continued to exert undue influence over the WBA to persuade the WBA to violate its own rules by requiring the parties to sign DKP's Bout Contract as opposed to the standard WBA Bout Contract, which contradicted the terms in the WBA resolution that expressly required the parties use the standard WBA bout Contract." *Id.* at ¶68.

"Despite Charr twice signing a standard WBA Bout Contract, Charr executed the revised DKP Bout Contract to ensure he was able to defend his title after the WBA threatened to strip Charr of his title if he did not sign the DKP Bout Contract." *Id.* at ¶70.

"When Charr was unable to travel to the United States as a result of not obtaining his P-1 Visa due to DKP's and King's obstruction tactics, the WBA cancelled the Charr/Bryan Bout. Thereafter, DKP and King once more exerted undue influence over the WBA by convincing the organization to strip Charr of his title as a result of the cancelled bout." *Id.* at ¶78.

Although the WBA argues that Charr should have appealed, Charr was stripped of his title on January 26, 2021 and Bryan was installed as champion on January 29, 2021.[7] *See* Compl., Exhibit J. Thus, the WBA did not give Charr time to file an appeal.[8] Additionally, the WBA ratings chair informed Charr's counsel that all decisions concerning the WBA's stripping Charr's title were made by Mendoza. ¶79. As alleged, the pay-to-play scheme set into motion by the WBA, Mendoza, and the King defendants aimed to crown Bryan the new WBA "Regular" Heavyweight Champion, *id.* and indeed, after stripping Charr's title, the WBA arranged a new title fight between Bryan and the far less capable boxer, Stiverne, to ensure Bryan replaced Charr as champion. *Id.* at ¶80. This required the WBA and Mendoza to similarly inflate Stiverne's rankings so he could face Bryan in the bout under the WBA's fighter ranking system as Stiverne had lost most of his recent bouts and was otherwise unqualified to contend for the title.

---

[7] There is a typo in the Amended Complaint which in paragraph 83 references January 30, 2021. The correct date is January 29, 2021. Mr. Bryan's record, which is an official and public document may be found at https://boxrec.com/en/proboxer/584916

8



**BlackSrebnick**
CIVIL | CRIMINAL

The WBA thus knowingly violated its own rules to arrange for Stiverne to face Bryan in the bout, which effectively guaranteed Bryan would be victorious. *Id.* ¶81-82. As expected, Bryan went on to defeat Stiverne for the title in Hollywood, Florida, on January 29, 2021, and, as a result, the King defendants were directly enriched as they received profits from Bryan's title win as his promoters. *Id.* Following the bout, the WBA and Mendoza then continued to collude with the King defendants as is also alleged in the Amended Complaint. On December 9, 2021, the WBA held another purse bid for a rescheduled Charr/Bryan title bout. This time, the bid was held in Miami with the purse for the fight split significantly in favor of Bryan who was now the reigning champion. *Id.* at ¶¶ 44, 84. Despite rescheduling the bout to make it appear as though Charr was given a chance to recapture his title (which is false), the WBA and Mendoza once again conspired with the King defendants to prevent the fight from going forward recognizing that Bryan could not defeat Charr.

To prevent the fight this time around, the King defendants incorporated additional terms in the purse bid contract for the bout, which made it impossible for Charr to qualify for the fight. Jettisoning the terms of the standard WBA purse bid contract, the King defendants' "new" terms in the revised purse bid contract required Charr to obtain his own P-1 Visa before December 29, 2021 (which was typically the promoter's responsibility under the WBA's standard purse bid contract), or Charr would be stripped by the WBA of the opportunity to fight Bryan for the title. The WBA then ratified the King defendants' "new" terms in the purse bid contract despite having required fighters to use the WBA standard bout contract in previous bouts. *See* Compl. at ¶¶80-90. The foregoing facts show a milieu for the individual counts pled against the WBA in the Amended Complaint as well.

9

**BlackSrebnick**
CIVIL | CRIMINAL

## II. The Muhammad Ali Act Violations Are Properly Pled

With respect to Count I, the WBA argues that Charr's claim should be dismissed because no harm is alleged. This is false as Paragraph 91 of the Amended Complaint makes clear that all previous allegations are incorporated by reference into Count I. This includes Paragraphs 55 and 61—referencing $1 million and $1.5 million losses suffered by Charr due to the WBA's violations of the Muhammad Ali Act. Moreover, Paragraph 102 (also in Count I) further alleges that Charr was harmed "as a result of violations of the [the Act] by King, DKP, Epic, and Mendoza as aforesaid" such that harm has certainly been alleged under Count I. *Id.* at ¶102. Additionally, while the WBA is (erroneously) not identified in Paragraph 102, the *ad damnum* clause in Count I states that Charr is seeking "actual and consequential damages in excess of two million dollars ($2,000,000.00)." *Id.* These allegations also demonstrate that Charr suffered damages due to the WBA's violations of the Act.

Finally, the WBA seems to suggest that the unjustified stripping of Charr's title by the WBA does not constitute "damages" as well. The Honorable Herbert Stern's opinion in the seminal case of *Duva v. World Boxing Association,* 548 F. Supp. 710 (D. NJ 1982) undercuts this argument entirely as Judge Stern made clear in *Duva* that: "No court can be oblivious to the kind of day in and day out punishment to which boxers subject themselves in order to become champions. Demonstrating the most demanding kind of physical discipline, they literally pound away, at great physical danger, in a single-minded effort to move up in the rankings." *Id.* at 719. While Judge Stern's opinion was written before the enactment of the Muhammad Ali Act, the expressed sentiments—and the goal of the Act—are the same: To ensure boxers like Charr are

10

**BlackSrebnick**
CIVIL | CRIMINAL

protected and have recourse against any ratings organization—like the WBA in this case—that violates a boxer's rights.

### III. Count II States a Valid RICO Claim Against the WBA and Mendoza

With respect to Count II, it is true the Court previously dismissed Charr's RICO claims against the King defendants; however, different considerations apply to Charr's RICO claim against the WBA, which is viable based on the existing allegations.[9] The Court's opinion (vis-à-vis dismissing the RICO claims against the King defendants) stated in relevant part: "Plaintiff does not allege that King or DKP 'operated or managed' WBA which Plaintiff alleges is a RICO enterprise . . . . [Compl, ¶105.]. Rather, as alleged in the Complaint, **WBA is 'operated and managed' by Mendoza**. [Compl., ¶¶26-30]." In other words, the Court signaled that Charr's allegations supporting his RICO claims against the WBA and Mendoza are sufficient. *See Cedric Kushner Promotions, Ltd v King, et al.* 533 U.S.168 (2001) (**"This case focuses upon a person who is the president and sole shareholder of a closely held corporation. The plaintiff claims that the president has conducted the corporation's affairs through the forbidden "pattern" . . . In these circumstances, are there two entities, a "person" and a separate "enterprise"? Assuming . . . that the allegations in the complaint are true, we conclude that the "person" and "enterprise" here are distinct and that the RICO provision applies."**) (emphasis added).

### III. The RICO Allegations Against WBA Are Well-Plead

The WBA also argues that the allegations supporting Charr's RICO claim lack sufficient particularity. The allegations supporting this claim are as follows:

---

[9] While Plaintiff declined to amend the complaint as to the King defendants under the theory that sufficient causes of action remain, this would not be the case as to the WBA should we not prevail.



CIVIL | CRIMINAL

"As part of this scheme, Mendoza and the WBA then prepared and disseminated on a monthly basis fraudulent WBA fighter rankings containing Bryan's elevated ranking. These fraudulent rankings were at all times distributed by Mendoza and the WBA via U.S. Mail and the internet (via WBA's website) such that Mendoza and the WBA have committed and continue to commit the crimes of mail and wire fraud by distributing these fraudulent rankings each month." *Id. at* ¶116.

Charr further alleges in support of his RICO claim that the WBA's illicit activities began at least as early as 2017. *Id.* at ¶117. Hence, the WBA cannot plausibly argue there is "a lack of particularity" with respect to these allegations. Moreover, Charr also alleges that one of the "gifts" given by the King defendants to the WBA (and prohibited by the Muhammad Ali Act as clear examples of bribery) occurred in February of 2020 as part of the ongoing pay-to-play scheme. *Id.* at ¶113. Furthermore, Charr also alleges that another element of this scheme (which similarly demonstrates a pattern of RICO activity by the WBA) involved the King defendants' payment of funds to Florida entity, Sports Consulting Services, LLC, which employed and/or had ties to at least one WBA employee and Mendoza's son. *Id.* at ¶¶98, 116.[10] There is also deposition testimony that proves the King defendants had repeatedly made payments to the WBA and/or Mendoza through Sports Consulting Services, LLC for years.

### IV. Charr's Claim Under Count IV is Not Directed at the WBA

Count IV of the Amended Complaint is not directed at the WBA despite being mentioned in WBA's Motion to Dismiss. As a result, no further discussion of this count is necessary.

### V. Charr's Civil Conspiracy Claim Under Count VII is Well-Pled

In the order entered October 31, 2022, the Court ruled that "the intra corporate conspiracy doctrine does not bar Plaintiff's claim as pled in the Amended Complaint which alleges King and DKP conspired with Mendoza and the WBA." Hence, it is unclear what the WBA is arguing

---

[10] It is accurate that we did not supply the date but the WBA is well aware that sworn testimony has been given in another case concerning this practice. *Maas v. Cohen*, Southern District of New York, 18-civ.-2239. The witness testified that he had been making payments to Sports consulting "for years". Discovery can disclose each payment.

12

**BlackSrebnick**
CIVIL | CRIMINAL

with respect to Charr's civil conspiracy claim as the order makes clear that Charr has pled sufficient allegations to support this claim, which is supported by the following allegations:

> "At all times material hereto, King, DKP, Mendoza, and WBA officials worked in concert to perpetrate the illegal and overt act of exerting undue influence on the WBA for the malicious purpose of persuading the WBA to strip Charr of his Heavyweight Championship title without cause and in violation of WBA rules." *Id.* at ¶155.
>
> "In major part, this was because Charr declined to give future promotion rights to King and DKP, something which he was not obligated to do under 15 U.S.C. § 6307b(b)." *Id.* at ¶156.
>
> "As a result of the illegal and overt acts committed by King, DKP, Mendoza, and WBA officials in furtherance of this conspiracy, Charr sustained damages including, but not limited to, the loss of his title as the rightful WBA Heavyweight Champion." *Id.* at ¶157.

The WBA cannot simply ignore these allegations—specifically, the allegations in ¶156—while arguing that there are insufficient facts pled to support Charr's civil conspiracy claim when the above allegations clearly prove the opposite.

## VI. The WBA's Motion to Dismiss Mischaracterizes the Amended Complaint

The WBA also tries to recast Charr's claims as a mere quibble over WBA Rules that should have been handled via the WBA's internal dispute procedure, which could not be further from the truth. As pled, Count I is based on the WBA's violation of federal law (i.e., the Muhammad Ali Act, *inter alia*, through a scheme violative of 15 U.S.C. § 6308(c) wherein monetary gifts having been openly solicited by WBA officers and employees including Mendoza). More specifically, Charr alleges that monetary payments were made by the King defendants to WBA-related entities (i.e., Sports Consulting Services, LLC) that employed and/or had ties to Mendoza's son and at least one other WBA employee. *Id.* at ¶98. Charr further alleges that the King defendants, **with the assistance of the WBA**, tried to extort future rights in a

13

mandatory bout situation from Charr by changing the terms of the standard WBA Bout Contract, which is prohibited by 15 U.S.C. § 6307b(b). *See, e.g., Id.* at ¶101.[11]

Under Count II, Charr similarly alleges, *inter alia*, that Mendoza and the WBA fraudulently manipulated the WBA's rankings to favor the King defendants' fighter, Bryan, in exchange for the King defendants making payments and/or providing gifts to Mendoza and the WBA through at least one third-party: Sports Consulting Services, LLC. *Id.* at ¶112. Charr alleges the WBA thus also violated federal law by engaging in sports bribery, which is prohibited under 18 U.S.C. § 224 ("Bribery in sporting contests"). Charr then alleges this illegality was ongoing and committed with the intent to influence the outcome of sporting events. *Id.* at ¶118.[12] In addition, Charr alleges the WBA also committed mail and wire fraud in interstate commerce as well in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1346 by disseminating fraudulent fighter ratings each month as part of this scheme to defraud. *Id.* at ¶116. The underlying allegations, while referencing WBA Rules, thus arise from **statutory violations** by the WBA that constitute federal crimes as opposed to a mere quibble between the Parties about Rule violations.

With respect to Charr's civil conspiracy claim, the same is true: the Court already ruled that the requisite elements of this claim have been properly pled based on the existing allegations, which show that Charr was being punished by Mendoza and the WBA for declining to give future promotion rights to the King defendants, something which Charr was not obligated

---

[11] The actions we allege against King and the WBA are incorporated into Count 1 through paragraph 91. Those allegations are replete with instances where the Muhammad Ali Act was violated. *E.g.* Compl. at ¶¶35-39.

[12] This is not a summary judgment motion, but we allege one reason Charr was passed over was because he was a tougher opponent for the King defendants' fighter. *See* Compl. at ¶82. This is equivalent to the NFL being paid to "skip over" the Philadelphia Eagles and insert the Chicago Bears into the playoffs because they are easier to beat. Obviously, this affects the outcome of a Sporting Contest which has been "fixed" in either scenario.


BlackSrebnick
CIVIL | CRIMINAL

to do under 15 U.S.C. § 6307b(b) of the Muhammad Ali Act. *Id.* at ¶156. The Court addressed a similar situation in *Schulz, et al. v. United States Boxing Association, et al.*, 105 F. 3d 127 (3d Cir. 1997) where the plaintiff filed suit against a ratings organization for misconduct under the law of Private Associations although, unlike in this case, there was time for the plaintiff to seek injunctive relief.[13] The Third Circuit explained in *Schulz* that the plaintiff's claim could survive a dismissal if: (1) the plaintiff had an interest is sufficient to warrant judicial action; and (2) the interest was subjected to an unjustifiable interference by the defendant. Applying the *Schulz* analysis to this case, there is no question that a World Title—namely, the WBA "Regular" Heavyweight Championship title taken from Charr by the WBA—presents a sufficient interest for Court intervention given the amount of money, endorsement deals, future bout opportunities, reputations, and careers at stake (namely, Charr's).

As for the second prong, *Schulz* makes clear that a ratings organization like the WBA subjects a plaintiff's interests to "unjustifiable interference" when its conduct is either driven by principles that violate public policy and/or its procedures offend principles of fundamental fairness. *In Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680 (1983); *see also Brounstein v. American Cat Fanciers Association*, 839 F. Supp. 1100, 1110-12 (D.N.J. 1993) (summarizing *Rutledge*). *See also Ross, NYU Review of Law and Social Change*, V. 4, Issue 1, Judicial intervention in the Conduct of Private Associations. Hence, because Charr alleges violations of the Muhammad Ali Act, RICO, and activity by the WBA amounting to "Sports Bribery", as

---

[13] The President of the Ratings Organization (the USBA/IBF) was subsequently charged with racketeering (https://a.espncdn.com/boxing/news/1999/1104/151048.nut.),and convicted and sentenced to prison. https://www.latimes.com/archives/la-xpm-2001-feb-15-sp-25740-story.html.

15

**BlackSrebnick**
CIVIL | CRIMINAL

aforesaid, the allegations in the Amended Complaint demonstrate a violation of public policy sufficient to support his RICO claim against the WBA.

## VII. The Court Has Jurisdiction Over Charr's Claims Against the WBA

The WBA further contends that this lawsuit should have been brought in Pierce County, Washington based on the organization's Rules and thus should be dismissed on these grounds as well. Again, this argument flows from the WBA's position that this action involves a mere dispute over its Rules (which it does not as previously discussed). The following allegations in the Amended Complaint make clear that the proper venue for Charr's claims against the WBA is with this Court: "1. One of the contracts at the core of this case expressly states . . . that the exclusive forum for any disputes **shall be the Courts located in Broward County in the State of Florida** (Compl., Ex. A and B); and 2. RICO provides that in 18 U.S.C. 1865:

> "In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof."

The cited provision is not governed by WBA Rules nor do the Rules govern Charr's claims against Mendoza or the King defendants. Additionally, 15 § U.S.C. 6309 states that "any boxer who suffers economic injury as a result of a violation of any provision of this Act **may bring an action in the appropriate Federal or State court** and recover the damages suffered, court costs, and reasonable attorney's fees and expenses." *Id.* The statute does not allow a defendant—in this instance, the WBA—to simply choose where an action is filed. Moreover, and no less significantly, the bouts at issue in this case also occurred in Broward County, Florida, where the King defendants' fighter, Bryan, was crowned the new WBA "Regular" Heavyweight Champion and thus where Charr's claims against the WBA, Mendoza, and the King defendants similarly

**BlackSrebnick**
CIVIL | CRIMINAL

Case 0:21-cv-61654-WPD Document 84 Entered on FLSD Docket 02/02/2023 Page 17 of 20

panel appointed by the president of that organization (i.e., Mendoza) which perpetrated tortious conduct against Charr, is, on its face, preposterous.

The Court in *Trout v. Organización Mundial de Boxeo, Inc.*, 961 F. 3d 71 (1st Cir 2020) addressed a similar situation and held that a comparable process was also invalid stating:

> "...we agree with Trout [a boxer] that the arbitration may not proceed under the Appeal Regulations, as we are not persuaded by the WBO's only arguments as to why, by permitting the WBO to act as -- in Trout's words -- "party and judge," the arbitration agreement is not so "unreasonable and unjust" as to be unconscionable..."

There is no reason for this Court to rule differently. The only distinction is that the panel appointed by the organization's president in *Trout* purported to be a final decision. Meanwhile, in this case, it was Mendoza who made the final decision with respect to the WBA stripping Charr's title. This is also supported by WBA Rule F.13, which reads:

> "...[B]ased upon the record presented to him for his review, **the President** may adopt in whole or in part the preliminary decision and may modify it before approving it. He may also remand it to the appeals panel for further consideration."

The venerable maxim, *"No one can be a judge in his own cause"* (Nemo Judex in *causa sua*), one of the fundamental principles of law, thus applies to this case. *See* Edward Coke, INSTITUTES OF THE LAWS OF ENGLAND, § 212, 141 (1628); Harris. *An Introduction to Law*. 8th Ed. 2016. p 474; *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 426 - 429 (1995). Despite the WBA's exhaustion of remedies argument as to Charr's statutory-based claims, without an explicit statutory requirement for exhaustion, the Court is "guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme." *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496 (1982). The Court must exercise sound judicial discretion when making this determination by balancing the individual's interest in retaining prompt access to a federal judicial forum against any countervailing institutional interests favoring exhaustion of such remedies. To this end, the courts heavily favor

**BlackSrebnick**
CIVIL | CRIMINAL

the individual's interests especially where, as in this case, resorting to the administrative remedy would cause undue prejudice to subsequent assertion of an action in court, and where there is some doubt as to whether the agency at issue is empowered to grant effective relief, or **where the administrative body is shown to be biased** or has otherwise predetermined the issue before it. *See McCarthy v. Madigan*, 503 U.S. 140 (1992).

Notably, the WBA also does not cite any legislative history to show that Congress intended some exhaustion of remedies for the statutory claims at issue (i.e., the WBA's violation of the Muhammad Ali Act and the RICO statute), and it is obvious that an internal process that ends up before the WBA and its president, Mendoza (as it would have in this case), raises severe doubt as to the bias of the governing body and thus whether any "internal" remedy was ever available to Charr. The WBA indeed cannot argue in earnest, when accepting the allegations in the Amended Complaint as true, that it would have granted damages against itself especially when, as pled, all of the WBA's actions up to this point prove that the organization repeatedly violated its own rules, engaged in ongoing criminal activity, and put its own corrupt interests before the career of one its fighters, Charr.

In short, the allegations in the Amended Complaint demonstrate that the "fix was in" with respect to the illicit actions taken by the WBA, Mendoza, and the King defendants to strip Charr of his title and crown the King defendants' fighter, Bryan, as the new champion so that each of the co-defendants would (and did) profit from this illicit scheme. Charr's allegations, along with the attached exhibits, further demonstrate that there was also no opportunity for Charr to "exhaust remedies" vis-à-vis the WBA's internal dispute process as the WBA and Mendoza afforded inadequate time for Charr to file an appeal. The allegations in the Amended

Complaint—which must be accepted as true—indeed show that Charr was champion on January 26, 2021, yet, by January 29, 2021, was inexplicably stripped of his title by the WBA after which the WBA crowned the King defendants' fighter, Bryan, as the new champion. The WBA, Mendoza, and the King defendants then took steps to prevent Charr from appealing this action decision and otherwise fighting Bryan to recapture his title.[16]

## CONCLUSION

Accordingly, because the WBA's Motion to Dismiss relies on an unsubstantiated, "blame the victim" theory that requires the Court to reject the veracity of Charr's allegations, draw factual inferences in the WBA's favor, and because Charr has pled sufficient ultimate facts to support each claim against the WBA as well as pursued these claims in the appropriate venue (as there were no administrative remedies available under the WBA's rules and regulations), the Court should deny the WBA's Motion to Dismiss Counts I, II, VI, and VII of the Amended Complaint.

Indeed, the allegations in the Amended Complaint make clear that Charr's claims against the WBA are not merely "a dispute with promoters over a missed title fight," Def. Mot. at 1, nor that the WBA was joined in this lawsuit "as a last-ditch effort to preserve [Charr's] conspiracy claims against the promoters." Def. Mot. at 2. To the contrary, the allegations show that the WBA—along with its officers and employees, including Mendoza—is a corrupt organization that colluded with the King defendants in violation of federal law to strip Charr of his title and otherwise cause Charr to suffer substantial damages as a result of the organization's corrupt practices.

---

[16] We would show in at trial that the Stripping and filling of the spot was even less in time, but at this point we are constrained by the pleadings.

WHEREFORE, Plaintiff, Mahmoud Charr, respectfully requests the Court deny Defendant, World Boxing Association Inc.'s, Motion to Dismiss Counts I, II, VI, and VII of the Amended Complaint, in addition to any other relief the Court deems just and proper.

Dated: February 2, 2023

Respectfully submitted,

BLACK SREBNICK, P.A.
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
305-371-6421 Telephone
305-358-2006 Fax

By: /s/ Jared Lopez
    Jared Lopez, Esq.
    Florida Bar No. 103616
    jlopez@royblack.com
    civilpleadings@royblack.com

*Counsel for Plaintiff Mahmoud Charr*

DINES AND ENGLISH LLC
685 Van Houten Avenue
Clifton, New Jersey 07013
973-778-7575 Telephone
973-778-7633 Fax

By: /s/ Patrick C. English
    Patrick English, Esq.
    New Jersey Bar No. 023811978
    dinesandenglish@aol.com

*Counsel for Plaintiff Mahmoud Charr*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court this 2nd day of February 2023 and electronically served via the CM/ECF system on: Alejandro Brito, Esq., Brito, PLLC, 2121 Ponce de Leon Boulevard, Coral Gables, Florida 33134, abrito@britopllc.com, apiriou@britopllc.com; Stacy J. Rodriguez, Actuate Law, 545 NW 26 St., Suite 640, Miami, Florida 33127, stacy.rodriguez@actuatelaw.com; Joseph J. Portuondo, Esq., 110 Merrick Way, Suite 3-B, Coral Gables, Florida 33134, jjp@portuondolaw.com.

By: /s/ Jared Lopez
    Jared Lopez, Esq.